Filed 1/22/21  P. v. Sosa CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JORGE LUIS SOSA, Defendant and Appellant. | D076457 (Super. Ct. No. SCN384049) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Jay K. Temple for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Between 2011 and 2016, IP's childhood was marred by the sexual abuse he endured from his great-uncle, defendant Jorge Luis Sosa.[1] IP's younger brother, LS, was also molested by Sosa, though less frequently. At his trial, Sosa denied any wrongdoing and suggested that perhaps two testicular "exams" he gave to IP had been misconstrued. IP, LS, and another adult nephew all testified that Sosa had sexually abused them. A jury convicted him of 26 out of the 27 charged counts.

On appeal, Sosa claims his due process rights were violated by the broad time spans associated with certain counts. We need not reach the particulars of his argument since we find this claim was forfeited. He also challenges the evidence supporting various convictions, claiming that (1) specific and general incidents cannot be sufficiently distinguished, (2) the testimony failed to establish the force necessary for certain counts, and (3) the evidence falls short of demonstrating some offenses were completed to the degree of contact or penetration that is statutorily required. For reasons we explain below, we conclude there was sufficient evidence presented for a reasonable jury to find Sosa guilty beyond a reasonable doubt as to each of the challenged counts. Consequently, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Sosa's Abuse of IP and LS*

Jorge Sosa was the uncle everyone loved. He was fun-loving, involved with his family, and supportive. Sosa had no children of his own, but maintained strong ties with his extended network of nieces and nephews. His house in Escondido was a gathering place, and it was not uncommon for

---

[1] With the exception of the defendant, we refer to parties in this case by their initials or first names to protect privacy interests. (Cal. Rules of Court, rule 8.90.)

Sosa and his long-term partner Robert to open their home to family members or friends who needed a place to stay. At various times, both the garage and the bar were converted into bedrooms to accommodate more people.

So when Sosa's niece Ivon found herself laid off after giving birth to her fifth child, she turned to her uncle, who had always been her confidant and a source of support. Sosa suggested she and the kids move to Escondido to live with him, rent free, until she got on her feet. He said it would be a new beginning for all of them. Ivon agreed.

They moved into Sosa's house in early 2011. Ivon and her infant daughter stayed in a bedroom while her two older daughters and two sons, IP and LS, slept in the converted bar. The family stayed until 2013, when Ivon leased an apartment just down the street. Even then, Sosa's house remained a central location in the children's lives. One of Ivon's older daughters, IH, lived there during her senior year in high school and the boys were regularly sent over to their uncle's house when Ivon needed childcare. Throughout the years, Sosa also helped Ivon financially. She accepted small loans from him, including $1,700 in 2017 she needed to file for bankruptcy.

At some point after they moved into the house, Sosa began molesting IP. IP generally remembered that it happened "throughout middle school," but he also recalled incidents from the period when his family lived with Sosa and after they moved out. IP turned nine in the summer of 2011, so he could have been as young as eight when the abuse started. It continued until mid-2016, and was only disrupted because IP moved to Los Angeles to live with his father. After that, Sosa turned his attention to LS. The younger boy was about twelve years old at the time.

For years, IP remained silent about the abuse; he was embarrassed and thought no one would believe him given Sosa's beloved status in the family.

3

He also noted that Sosa was "very nice" to Ivon and that "he helped us just a lot." But in early 2018, two events prompted IP to tell someone. The first was a holiday gathering where he learned from his cousin that his Uncle Patrick had also been abused by Sosa as a child. The second was a classroom conversation where IP's male teacher shared that he had been molested as a child. That same day, IP called Patrick to tell him what happened. Patrick assured IP it was not his fault and, at IP's request, called Ivon to tell her. While she was still on the phone with Patrick, Ivon asked LS if Sosa had touched him, and her youngest son nodded. The next day, Patrick drove down from Los Angeles with IP and they went with Ivon and LS to file a police report in Escondido. Within a few days, both IP and LS had forensic interviews to document their accounts.

Sosa was charged by the San Diego District Attorney with 27 counts in total; counts 1 through 25 concerned his abuse of IP, alleging oral copulation with a child 10 years or younger (Pen. Code, § 288.7, subd. (b)),[2] forcible lewd or lascivious acts on a child under 14 years (§ 288, subd. (b)(1)), and aggravated sexual assault of a child under 14 years (§ 269, subd. (a)). Only counts 26 and 27 addressed Sosa's abuse of LS, alleging lewd or lascivious acts on a child under 14 years, but without force (§ 288, subd. (a)). Most counts also included allegations of more than one victim (§ 667.61, subds. (b), (c) and (e)), and substantial sexual conduct with a child under 14 (§ 1203.66, subd. (a)(8)).

2.    *The Trial*

LS, IP and Patrick all testified about Sosa's abuse. While no other family members witnessed anything inappropriate, IH did notice that Sosa

---

[2]    All further statutory references are to the Penal Code.

"catered to the boys," took them on special outings, and generally paid more attention to them.

LS testified that Sosa touched him inappropriately once, likely sometime in 2017, after his brother moved to Los Angeles. They were in Sosa's bedroom with the door closed. At first, Sosa asked to see LS's pubic hair. Then he reached down LS's pants and touched his nephew's penis with his hand. Although LS initially reported to police that this happened twice, he only testified to one incident at trial.

IP recounted a much longer history of abuse. His uncle was a father figure whom he trusted and loved very much. Sosa started "touching" him after his family moved into the house. It happened "whenever we would be alone" and usually took place in Sosa's room.[3] He testified in general terms that Sosa orally copulated him often and typically touched his penis during these episodes, which happened more than once both while he lived with Sosa and afterward. He could not remember every time the abuse happened, but he did have distinct memories of some incidents: one that took place in the shower, one in his sister's room, one in the garage, and events that occurred the night before Sosa took him to the fair.

As to the shower incident, IP remembered one time when the other shower in the house was occupied by one of his siblings, so he went into the master bathroom—which was connected to Sosa's room—to shower. Sosa came in, reached into the shower, touched his penis, and told him he loved him and would not hurt him.

The garage incident took place after IP's family moved down the street. At his mom's instruction, IP went to Sosa's house one day after school to pick

---

[3] Although Sosa's partner of more than 30 years also lived in the house, they slept in separate bedrooms.

out a Halloween costume. Sosa took him to the garage where the costumes were stored and pulled out a box, but then took off IP's pants, held his arms down, and orally copulated him. He stopped when they heard Ivon's car pull up in the driveway. This was the only time something happened in the garage.

The incident in IH's room also occurred during this general time frame. IH moved back to Sosa's house during her last year in high school and stayed in the same room the children had previously shared. At some point, IP, Sosa and IH were all in that room when she left to take a shower. Sosa then held IP down on the floor, took off his pants, touched IP's genitals with his hands, and orally copulated him. IH came back briefly, apparently to retrieve something she forgot, and Sosa pulled IP's pants back up and pretended he had been tickling IP. IH never saw anything inappropriate take place.

In addition to these distinct events, IP also remembered instances when the abuse escalated. On at least three occasions, Sosa made IP engage in sodomy.[4] He used lotion on IP's penis and directed it to Sosa's "butthole"; this happened more than one time. IP did not provide granular details but did distinguish between the "butthole" and "outside of the butt" to indicate where his penis went. On one occasion, Sosa also used his penis to touch IP's butthole.

The last specific incident IP could remember took place the night before Sosa took IP and LS to the Del Mar fair in the summer of 2016. The boys spent the night, and IP was nearly asleep in the living room when Sosa got him up and pulled him into the bedroom. He stroked IP's penis with his

_____

[4] Sodomy is "sexual conduct consisting of contact between the penis of one person and the anus of another person." Although the conventional understanding of forcible sodomy might assume the victim as the person who was penetrated, the statute makes no such distinction. (§ 286, subd. (a).)

hand, orally copulated him, and then touched IP's "butthole" with his finger. At that point, IP pushed his hand away and managed to leave. Sosa apologized. That same night, Sosa also made IP orally copulate him. This incident seemed difficult for IP to recount; he testified in general terms at the preliminary hearing that Sosa pulled his head toward Sosa's penis and tried to force copulation, but at trial he explained that was not how it happened. No physical force was used, he just trusted Sosa—who made him think it would be okay.

Patrick's account, which detailed three incidents from his childhood, was offered as propensity evidence. There were significant similarities between the type of behavior Patrick recounted and that reported by IP and LS. It started when Patrick was 8 to 10 years old. The first time, Sosa made Patrick expose himself, grabbed Patrick's penis and then masturbated in front of him. In the second incident, Sosa orally copulated Patrick while another cousin slept in the same room. Patrick was able to leave during the third incident before it went very far, but Sosa started by massaging Patrick with lotion and then apologized when Patrick got up and left.

Patrick's experience was broadly corroborated by his oldest child, who testified that her father relayed the story of his abuse to her before she and her siblings visited Sosa's house for an overnight. He told her so she could keep an eye out for her younger siblings during the trip. For his part, Patrick remembered this conversation differently. He thought he talked to all of his children about molestation to help them be aware of what could happen and disclosed his experience with Sosa to demonstrate that "sometimes it's the people that you least expect." Generally, Patrick thought his abuse was an isolated relational dynamic and gave Sosa the benefit of the doubt that he would not repeat the behavior.

7

The defense witnesses included Robert (Sosa's partner), Oscar (another nephew), Theresa and the defendant. Oscar and Theresa both lived in the house after IP and LS moved out and never observed inappropriate conduct between Sosa and the boys. Oscar also lived with Sosa for periods in his childhood and was never abused. Robert generally expressed his shock at the allegations.

Sosa's account was something short of a blanket denial; although he asserted he was never inappropriately sexual with his nephews, he said he gave IP two testicular exams and showed him how to masturbate when his nephew complained of pain.[5] But he denied it was sexual, and also denied ever touching Patrick or LS in any way. Sosa's interview with the police, where he discussed these exams, was also played for the jury. There was scant evidence offered to suggest a motive for any of Sosa's nephews to fabricate the allegations. Sosa apparently removed Ivon as a beneficiary on his retirement accounts in 2017, and in closing argument the defense suggested the boys lied for "financial reasons." But even from the defense perspective it was unclear how Ivon, her sons, or Patrick would benefit financially from conspiring to frame Sosa for sexual abuse.

The jury convicted Sosa of counts 1 through 26 out of the 27 charged and found all the associated allegations true. He was only acquitted on the last count, which alleged a second incident as to LS.

---

[5] Sosa worked as a pediatric medical assistant and it was not uncommon for him to attend to medical complaints in the family.

## DISCUSSION

1.    *Due Process*

The defendant's first contention concerns the broad time periods associated with his convictions. He asserts these date ranges—some of which exceed five years—denied him due process because they prevented him from mounting an effective defense. The crux of Sosa's argument is that because there is no authority expressly approving such long time periods, they must be constitutionally impermissible.

We first observe that the primary authority on this point, *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*), suggests a contrary conclusion. The *Jones* court considered the tension between due process and the often generic nature of sexual abuse allegations from children, and determined that in cases where the defendant either lives with or has "continuous access" to the child, generic allegations "by no means deprive the defendant of a reasonable opportunity to defend." (*Id*. at pp. 299, 320.) This is largely because alibi and mistaken identity defenses can rarely be employed by defendants who have ongoing access to and a relationship with a child-victim. In such cases, denying the abuse and challenging the child's credibility is usually the only feasible course. (*Id*. at p. 320.) Sosa attempts to distinguish his case from *Jones* because he did not live with IP and LS during the entire period in which the crimes occurred. But in making this argument, he ignores his routine and continued access to the children. He lived just down the street, and the witnesses offered a general consensus that IP and LS visited Sosa's residence frequently after they moved out. Sosa thus had continuous access to the children throughout and, accordingly, the rationale in *Jones* applies to all of his convictions—not merely those from the period where the boys lived with him.

9

The defendant takes further issue with any application of *Jones* that would broaden it beyond the two-month time periods it considered. (*Jones, supra,* 51 Cal.3d at p. 303.) Subsequent cases indicate some expansion is permissible but provide little guidance on the upper limits. (See *People v. Gear* (1993) 19 Cal.App.4th 86, 95 [applying *Jones* where the abuse occurred over several months]; *Brodit v. Cambra* (9th Cir. 2003) 350 F.3d 985, 989 [approving the appellate court's application of *Jones* where charged date ranges spanned more than one year].) However, we need not reach the more difficult question of whether a six-year period pushes *Jones'*s due process analysis past its parameters because we conclude Sosa forfeited this claim.

According to Sosa, he raised a due process concern about the length of the charging periods at the beginning of the preliminary hearing. Prior to IP's testimony, defense counsel did lodge some concerns regarding the complaint, noting that although she had no problem with the prosecutor charging date ranges in general, she could not easily determine which conduct aligned with which dates—a problem that was magnified by the poor audio quality in IP's forensic interview. The court discussed these challenges with counsel and acknowledged the due process implications. It also commented that more changes might be merited after they heard IP's testimony. When the hearing concluded, the court allowed the prosecution to amend the timeframes in the complaint consistent with IP's descriptions and bound over on all the counts. Sosa was arraigned on an information filed two weeks later.[6]

But even if we liberally construe defense counsel's early comments as challenging the *length* of the date ranges, the objection should have been

---

[6]    The People filed an amended information at the time of trial that abandoned a handful of the counts.

10

pursued after the pleading changes that followed the preliminary hearing. Given the number of incidents and the problem with the forensic interview, both the prosecution and the defense lacked clarity as to the precise nature of IP's allegations before the hearing. It was only afterward that the People were able to ensure that the charging allegations in the information would be consistent with IP's anticipated trial testimony such that Sosa could fully understand the nature of the charges. It was at this point that Sosa should have alerted the trial court if he truly believed the date ranges specified in the information precluded him from mounting a defense.

Yet there were no objections or even concerns raised on these grounds either at the conclusion of the preliminary hearing or in the intervening period of about a year before the trial began. And procedural devices were available for just this purpose. Sosa could have demurred to the information (§ 1004) or filed a motion to set it aside (§ 995). (See, e.g., *People v. Garcia* (2016) 247 Cal.App.4th 1013, 1022; see also *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 523.) Because he did not take *any* steps to challenge the broad time ranges on due process grounds at any point after the preliminary hearing, Sosa's attempt to revive this argument on appeal fails. (See *People v. Riggs* (2008) 44 Cal.4th 248, 292 [to preserve a due process claim, defendants must properly raise it in the trial court].)

2. *Sufficiency of the Evidence*

Sosa also contends there was insufficient evidence presented at trial to sustain his convictions as to abuse of IP, and he raises various theories on this point that we address in turn. At the outset, however, we note that in making these arguments Sosa faces significant challenges. When considering a sufficiency-of-the-evidence challenge, appellate courts review the record in the light most favorable to the judgment to determine if there is reasonable

and credible evidence from which any rational jury could have concluded the defendant was guilty beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  We also "presume ' "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Thompson* (2010) 49 Cal.4th 79, 113.)  "We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*People v. Pre* (2004) 117 Cal.App.4th 413, 421.)

To understand Sosa's arguments, it is necessary to summarize his convictions and the conduct and time periods associated with each.  There are two kinds of charges at issue in this case—those supported by IP's generic testimony about the abuse, and those based on testimony concerning specific incidents he remembered.  The counts based on generic testimony were often charged as first and last times for a particular type of conduct during a certain period.  There are three primary time periods, although some counts do not align precisely with these dates:  the first spans from January 1, 2011 to July 7, 2013, when IP lived with Sosa; the second covers July 8, 2013 to April 30, 2016, when IP lived in a nearby apartment; and the third runs from May 1, 2016 to July 26, 2016, the summer immediately before IP moved to Los Angeles.

Counts 1 through 7 all took place during the first period.  Counts 1 through 4 (based on two incidents each charged in the alternative under two different statutes) allege a first and last time that Sosa orally copulated IP.  Counts 5 through 6 cover a first and last time where Sosa touched IP's penis with his hand.  Count 7 is based on the specific shower incident where Sosa came into the bathroom and touched IP's penis.

Counts 8 through 11, and 13 through 16 all took place during the second period.  Counts 8 through 11 are counterparts to 1 through 4,

concerning the first and last times that Sosa orally copulated IP (again charged in the alternative). Counts 13 and 14 are the first and last time Sosa touched IP's penis with his hand. Counts 15 and 16 are based on specific incidents and, respectively, they concern Sosa orally copulating IP in the garage and touching IP's penis in IH's room.

Counts 12, and 21 through 24 happened in the third period and cover abuse that occurred the night before the fair—namely, Sosa's oral copulation of IP, sexual penetration of IP's anal opening with Sosa's finger, and IP's oral copulation of Sosa.[7] Finally, counts 17 through 20 span the first two periods, from 2011 to 2016, and are charged in the alternative for two incidents: the first and last time that Sosa made IP engage in sodomy.

a. *Distinguishing first and last incidents from specific incidents*

Sosa asserts that IP's generic testimony supporting counts 1 through 6, 8 through 11, and 13 through 14 cannot be differentiated from the particularized incidents that support Sosa's convictions for conduct in the garage, the shower, IH's room, and before the fair. After a careful review of the record, we conclude that a reasonable jury could find these incidents were all separate based on IP's testimony.

IP's general testimony specified that Sosa abused him "whenever we would be alone." It happened in Sosa's room, where IP recalled Sosa would sometimes lock the door, and then "tell me that he won't hurt me, that it's going to be okay[,] [and then] take off my clothes and touch me in places I wouldn't like." When he elaborated more on what generally occurred, IP explained that Sosa would orally copulate him "the most," and that this conduct happened both while they lived together and afterward. He also

---

7    While count 12 was charged in a broader period, IP testified at trial that it happened the night before the fair.

answered affirmatively when asked if Sosa orally copulated him "often," and if there were "multiple" incidents of this kind that spanned the first and second periods. Linking the copulation with manual touching, IP explained that Sosa usually touched his penis with his hand at some point during the episodes of oral copulation. He affirmed that Sosa touched him this way more than once both when he lived with Sosa and after his family moved out.

Taken as a whole, IP's testimony indicates Sosa generally abused him in the master bedroom and that he touched IP's penis with his hand and orally copulated him at least twice in both the first and second periods. There is also a strong suggestion that this occurred more than twice. Although phrases like "whenever we would be alone" are admittedly ambiguous regarding frequency, a strong inference can be drawn that this abuse was a regular fixture of IP's childhood.

In terms of distinguishing the specific incidents IP recalled from the less memorable first and last times, there were significant factors setting the specific incidents apart that could lead a reasonable jury to conclude they were additional abuse events.

As to the shower incident, IP specifically testified that he could not really remember the first time that Sosa touched his penis with his hand, but he had a distinct memory of an incident in the shower. This indicates it was not the first time. At other points, IP expressed difficulty in recalling last incidents of abuse, and affirmed that it happened so often he could not remember every time. Given our deferential standard of review, this is enough for the jury to reasonably conclude the specific shower incident did not overlap with the first or last time Sosa touched IP's penis while they lived together.

14

The incidents in IH's room and the garage were both distinguished by their unusual settings, and this difference provided enough grounds for a reasonable jury to conclude they were distinct from the more routine abuse IP described as taking place in Sosa's room. (See *Jones, supra*, 51 Cal.3d at p. 316 [describing how reference to abuse in a certain location can help establish the number of acts in child molestation cases].) Indeed, the prosecutor suggested that this change of setting accounted for IP's stronger recollection; it was precisely the deviation from the norm that made these incidents memorable.

A similar logic applies to the abuse that occurred the night before the fair. Although it happened in a familiar setting—Sosa's bedroom—it was distinguished by the activity. It was also set off temporally, taking place in a distinct third charging period during the summer before IP moved to Los Angeles. IP remembered this night well, perhaps because it was the only time that he was made to orally copulate Sosa and that Sosa touched IP's anal opening with his finger. It is unclear if the latter happened more than one time, but IP's testimony indicated it was not a common occurrence.

The prosecution's treatment of these as independent events throughout the trial reinforces our conclusion that a reasonable jury could have concluded as much. In the prosecutor's closing argument, she specifically distinguished the incidents in the garage, the shower, IH's room, and the night before the fair from the other charges. She also explained that some other counts, which were charged in the alternative, provided two different paths to a conviction for the same underlying conduct. The reasonableness of this particular jury's deliberations are not determinative in our review, but it is helpful to note that it is highly unlikely Sosa's jury mistakenly believed the *same* conduct could form the basis for the specific and generic counts. He was

convicted of the generic and specific counts as separate incidents by the same attentive panel that found there was insufficient evidence that he abused LS more than once.

This issue was further considered by the trial court at Sosa's sentencing hearing when it stayed some of the alternatively charged counts based on section 654. The court made a finding that the specific incidents were distinct from the first and last generic incidents. "There were certain counts, first time, last time, within a certain date range. There were also, *separate from those counts*, particular incidents that the victims were able to recall and stood out to them that were charged separately. "I don't find that those were covering the same acts . . . I do find all the counts are different acts, different locations, different time frames." (Italics added.) Given the record before us, we are convinced a reasonable jury could draw the same conclusion. Insofar as Sosa argues we should attend to inconsistencies in IP's testimony, particularly parts of his cross-examination where he expressed more uncertainty than in his direct testimony, we decline the invitation to reweigh IP's credibility. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

b.  *Evidence of force or duress*

Next, Sosa asserts that IP's testimony was insufficient to support the element of force needed to convict on counts 3 through 7, 10 through 11, and 13 through 14. All of these fall under section 288, subdivision (b)(1), which penalizes an aggravated lewd act on a child under 14 by means of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." Sosa correctly notes that IP testified he was never threatened, but he glosses over duress—one of the enumerated possibilities in subdivision (b) and the one that best fits this fact pattern.

16

An outright threat is not required to sustain a conviction under subdivision (b).  (§ 288, subd. (b).)  Duress is an independent aggravating factor apart from the others listed.  (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 (*Schulz*) [" 'Duress' would be redundant in the cited statutes if its meaning were no different than 'force,' 'violence,' 'menace,' or 'fear of immediate and unlawful bodily injury.' "]; see also *People v. Soto* (2011) 51 Cal.4th 229, 239 (*Soto*) [detailing the legislative history of section 288, subdivision (b) and amendments to the list of aggravators].)  Even when "the victim testifies the defendant did not use force or threats [that] does not preclude a finding of duress."  (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072 (*Thomas*).)  In this statutory context, duress is defined as " 'a direct or implied threat of force, violence, danger, *hardship* or retribution' " that is enough to coerce a reasonable person to engage in, or submit to, acts they would otherwise not have performed.  (*People v. Leal* (2004) 33 Cal.4th 999, 1004.)  Juries are instructed to "consider all the circumstances" in evaluating duress, including the age of the child and the child's relationship with the defendant.  (CALCRIM No. 1111; see also *People v. Cochran* (2002) 103 Cal.App.4th 8, 16 (*Cochran*).)  Consequently, we assess whether the evidence—including the holistic "totality of the circumstances"—provided a basis for a rational jury to conclude that IP was coerced into the lewd acts by an implied threat of hardship, danger or retribution.

A review of the relevant case authority puts the facts of this case comfortably within the realm of duress.  "When the victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases."  (*Thomas*, *supra*, 15 Cal.App.5th at pp. 1072–1073.)  Although Sosa was not IP's biological father, he was seen by many family members in this light.  IP described his relationship with Sosa in these

17

terms: "He was like a father to me. I just—I loved him very much. I trusted him." Nearly all the testifying family members repeated this characterization; Sosa was a father figure to many in the family, and IH noted that he took on this role for the boys in particular. They would camp together in the back yard, play video games, and he planned "special days" for them. Considering Sosa's fatherly role, IP's young age when the abuse began (likely eight or nine), and the fact that they lived together, there is no reason to distinguish this case from others that find duress when a father molests a child in the family home. (See *Cochran*, *supra*, 103 Cal.App.4th at p. 15 [duress supported when a nine-year-old victim seemingly went along with her father's abuse].)

Several other factors indicative of duress are also present here. IP was much smaller than Sosa, who weighed approximately 250 pounds. (*Schulz*, *supra*, 2 Cal.App.4th at p. 1005 [relative size of abuser and victim is a duress factor].) One obvious reason that size matters is the offender's ability to physically control the child, which happened here; IP explained that on several occasions he could not physically get away from Sosa, who held his arms down or held him down on the ground to accomplish the lewd acts. IP would try to push him off, but Sosa would not let him. In IP's words, "He was too big . . . . I wasn't strong enough to push him away from me." Although this might amount to no more than the force physically necessary to complete the assault—which would fall short of establishing *force* under subdivision (b)—it is nonetheless an additional indicator of duress. (*Soto*, *supra*, 51 Cal.4th at p. 242; *Thomas, supra,* 15 Cal.App.5th at p. 1072 [abuser "physically controlling the victim when the victim attempts to resist" supports duress].) Continuous abuse over time and assaults that "took place in an isolated room out of the presence of other adults" are yet more

indicators of duress that were also present in this case. (*People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d 235, 238–239 (*Kneip*).) These factors alone may be enough for a reasonable jury to find the lewd acts were committed by duress. (See *Mena v. Muniz* (C.D.Cal., Nov. 18, 2015, No. CV 15-2691-JGB (KS)) 2015 U.S. Dist.Lexis 171615, *15.) But the psychological manipulation and the power dynamics in the family provide even more significant evidence of duress.

Sosa groomed IP to accept the abuse, starting with touching and oral copulation and then introducing more varied sex acts over time. He used his "longstanding relationship of trust" (*Kneip, supra,* 219 Cal.App.3d at p. 238) to manipulate IP, telling the boy he loved him and would not hurt him. He even apologized when IP managed to leave the room—a tactic he piloted on Patrick. Indeed, Sosa retained Patrick's trust such that as an adult, he still gave Sosa the benefit of the doubt. The results of his grooming IP were even more severe. IP continued to trust Sosa even *during* incidents of abuse. He testified that, although he did not want to engage in sex acts with Sosa, his uncle "made me think it was okay." As we have previously observed, "[t]he very nature of duress is psychological coercion." (*Cochran, supra*, 103 Cal.App.4th at p. 15.)

The uneven division of power in the family may have compounded Sosa's coercive influence on IP, and certainly demonstrates an implied threat of hardship. When the molestation started, IP's family was living with Sosa because Ivon had lost her job and was caring for a new baby. Although the nuances of this arrangement might have been best understood by the adults involved, children are capable of appreciating their parent's dependence on another person. And this dynamic was not lost on IP. In explaining why he stayed silent about the abuse, IP mentioned that Sosa helped his family a lot.

19

He was also acutely aware of his mother's close relationship with Sosa. Ivon loved her uncle, depended on him, and looked up to him. Even after IP moved to Los Angeles and no longer lived with his mother, it was so difficult for him to confront her with the shattering news of Sosa's abuse that he asked Patrick to tell her instead. All of this evidence supports the conclusion that the family power dynamics, in which Sosa provided both financial and emotional stability, contributed to an implied threat of hardship if IP did not submit to the abuse.

Taken as a whole, the record tells the story of a young boy who was singled out and preyed on by a beloved uncle who supported his mother in multiple ways. Sometimes IP physically resisted the abuse—but it did not matter. His uncle would hold him down or grab his arms. This degree of force, while not overtly violent, sent a message that he needed to submit. And he did. He submitted out of necessity, but also out of love and trust, even though the abuse embarrassed him and made him uncomfortable. He endured it for many years, initially protecting his family's relationships and stability while his mother got back on her feet; he then continued to do so when she relied on his abuser for childcare and small loans. It was not necessary for his uncle to hint that adverse consequences would follow if the boy told someone. He knew that his family could lose his uncle's support, which was a strong fiber in the social fabric that provided them with stability.

Given this broader context, a reasonable jury could find beyond a reasonable doubt that the abuse was accomplished by means of duress. Whether any other inferences could be drawn from the record is irrelevant. (*Marroquin v. Hernandez* (C.D.Cal., Jan. 24, 2013, No. CV 08-2658-CJC (JC)) 2013 U.S.Dist.Lexis 52659, *28, *46 [faced with a record that could support

20

either a finding of duress or lack thereof, the reviewing court must respect the jury's inference].)

   c.     *Evidence supporting counts 7 and 12*

Sosa advances a thin argument that IP's testimony is inconclusive as to whether the defendant actually touched IP's penis during the shower incident. In the relevant portion of his testimony, IP emphasized he "tried to scoot away from him" and the defendant kept "trying to reach for [IP's] penis." The prosecutor then asked, "And were you standing in the shower when [Sosa] used his hand to touch your penis?" to which IP replied, "Yes." The defendant asserts that, due to the form of this question, it would be "entirely speculative to say whether the testimony meant anything other than:  yes I was standing in the shower." We need not speculate to conclude that IP answered affirmatively because the question was an accurate description of how this incident took place. Moreover, a reasonable jury could easily conclude he answered yes to both parts of the question.

Sosa also contends there was insufficient evidence of force or duress to support counts 7 and 12 specifically. We refer to our discussion above on that point.[8] We also note the defendant's faulty premise that duress must be demonstrated for each count in isolation; if a jury were bound by that analytical approach, its ability to consider the holistic circumstances would be undermined. (See *Mendez v. Davey* (C.D.Cal., Aug. 18, 2017, No. EDCV-

---

[8]     In challenging count 12, Sosa suggests this conviction requires an additional showing (beyond what is required for a section 288, subdivision (b)(1) offense) that the act was accomplished against the victim's will. (§ 269, subd. (a)(4); § 287, subd. (c)(2)(A).) This statutory factor is irrelevant in a child abuse case. The jury instruction, which was provided, explains this element as a lack of consent. (CALCRIM No. 1015.) It is well established that children cannot consent to sex acts with adults as a matter of law. (*Soto, supra,* 51 Cal.4th at p. 238.)

15-2496-PSG (JEM)) 2017 U.S.Dist.Lexis 156852, *25 ["California permits generic testimony in child molestation cases . . . and does not require the prosecution to specifically link the evidence of force to each act of sexual assault."].)

> d. *Evidence that penetration occurred as to counts 17, 18 and 23*

The defendant's last argument is that IP's testimony did not clearly establish penetration occurred—which is a necessary element for three of his convictions. Counts 17 and 18 (§§ 269, subd. (a)(3), 286, subd. (a)) and Count 23 (§§ 269, subd. (a); 289, subds. (a) and (k)) all require sexual penetration, "however slight."

But these statutes do not provide clear definitions or explain precisely what constitutes anal penetration. We turn to *People v. Paz* (2017) 10 Cal.App.5th 1023 (*Paz*), which gave thorough treatment to this question. In *Paz*, the court considered the historical development of the sodomy law and its relation to the other three major sex offenses—rape, oral copulation, and sexual penetration. (*Id.* at pp. 1030–1033.) Relying on the Supreme Court's commentary in *People v. White* (2017) 2 Cal.5th 349, 357 that "the provisions regarding the four major sex crimes [substantively] parallel each other," the *Paz* court reasoned that penetrative thresholds defined in rape law should inform what constitutes penetration of the anus. (*Paz,* at p. 1032.) In the context of rape, penetration of the external female genital organs—that is, the outer labia majora—is sufficient "even if the rapist does not thereafter succeed in penetrating into the vagina." (*People v. Karsai* (1982) 131 Cal.App.3d 224, 232.) The *Paz* court went on to provide a detailed analysis of the anatomy of the anus and conclude that the outermost part of the perianal skin—marked by the wrinkled or folded dermis that radiates from the anus—is as much a part of the external anal structure as the labia is to the vagina.

(*Paz,* at pp. 1034–1035.)  Finding "no reason to adopt different penetration rules for the anus and the vagina," it consequently held that there must be "penetration past the buttocks and into the perianal area but [not] penetration beyond the perianal folds or anal margin."  (*Id.* at p. 1038.)

The question before us, then, is whether the testimony elicited at trial would allow any reasonable jury to conclude beyond a reasonable doubt that the incidents IP described involved penetration past the buttocks and of, at a minimum, the perianal folds or anal margin; under *Paz*, nothing more is required.  (*Paz, supra*, 10 Cal.App.5th at p. 1038.)  The defendant argues IP's testimony was too vague on this point, but we disagree.  IP distinguished between touching that occurred to the "outside of the butt" and the "butthole."  A jury could reasonably have inferred "outside of the butt" meant buttocks and "butthole" meant anus.  That is actually the plain conclusion, given the colloquial meaning of the terms IP used.  (See Merriam-Webster's Online Dictionary (2021) <http://www.merriam-webster.com/dictionary/butt> [as of Jan. 20, 2021], archived at <https://perma.cc/LY3A-KFDF>, and <http://www.merriam-webster.com/dictionary/butthole> [as of Jan. 20, 2021], archived at <https://perma.cc/2MJ3-L6GJ>.)  As such, a reasonable jury that credited his testimony could have found there was penetration on all three counts consistent with the *Paz* court's "broad view of genital boundaries." (*Paz,* at p. 1037.)  We sincerely doubt that IP meant to describe another part of the anatomy shy of the anus when he used the term "butthole."  Even if that were a possibility, however, the evidence need not "conclusively rule out various scenarios under which defendant might not be guilty." (*People v. Bolden* (2002) 29 Cal.4th 515, 553.)  It only needs to support the judgment. That threshold has been met in this case.

## DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

GUERRERO, J.